Filed 2/27/24  P. v. Haywood CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>RONYAE HAYWOOD,<br><br>     Defendant and Appellant. | A164910<br><br>(Alameda County<br>Superior Ct. No. 20-CR-005184A) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ANGEL SHAVERS,<br><br>     Defendant and Appellant. | A164913<br><br>(Alameda County<br>Superior Ct. No. 20-CR-005184B) |

Ronyae Haywood and Angel Shavers appeal from their convictions related to the shooting deaths of two men in a firearms transaction gone wrong.  In these consolidated appeals, we consider their claims that the trial court erred in various evidentiary, instructional, and sentencing decisions. We reject these claims, but we order the correction of Haywood's abstract of judgment.  We otherwise affirm.

1

## I.
### FACTUAL AND PROCEDURAL
### BACKGROUND

The shootings occurred on March 13, 2020.  At that time, Haywood and Shavers were a couple, and Shavers was pregnant with their child.  They arranged to sell an AK-style semi-automatic rifle in exchange for money, a handgun, and an ounce of marijuana.  The location designated for the sale was a parking lot behind a grocery store in San Leandro, near the home of Haywood's father.  Haywood drove to the location, with Shavers in the car's passenger seat.  He pulled up next to the car of a man named Dwayne Palmer, and they parked next to each other in a corner of the parking lot.  Haywood testified at trial that Palmer asked to see the rifle, which was on the back seat of Haywood's car wrapped in a jacket.  Haywood moved the rifle to the trunk of Palmer's car.  Palmer then showed Haywood the handgun that was to be included as part of the transaction, and Palmer said the pistol was loaded.

According to Haywood, he asked Palmer for the pistol as well as the money and marijuana.  Palmer sat in the driver's seat of his car, then reached to the center console where he said the items were located, and then pointed a gun at Haywood's lower abdomen.  Haywood testified that Palmer said, "This one's on you," and Haywood heard someone in the front passenger seat say, "Shoot that N[-word]."  Fearing for his and Shavers's lives, Haywood shot Palmer with a gun he was carrying in his jacket.  He continued shooting at Palmer's car as it started to drive away.  In total, he shot 10 times.

Haywood testified he heard gunshots coming from Palmer's car, and witnesses also reported that someone in Palmer's car returned fire.  Two men who had been in Palmer's car got out and ran away.  Haywood got into his

own car and drove away. He soon got out of the car and told Shavers to drive away.

Palmer suffered three gunshot wounds and died of a gunshot wound to the head. Tyler Kline, a man who was in the back seat of Palmer's car who Haywood later claimed he had not seen, suffered two gunshot wounds and also died.

Haywood's father heard the gunshots and ran toward an alleyway near the grocery store. Two men ran past him and past a car where someone was calling for the men to get inside. Haywood's father left the area after he heard sirens and realized there was nothing he could do. When he returned home around a minute later, Haywood was there, but Shavers and the car Haywood had been driving were not. Haywood's father drove Haywood to Oakland and dropped him off in a neighborhood where Shavers was waiting with the car.

Investigators found an "AK type rifle" in the trunk of Palmer's car as well as a loaded Glock 27 pistol on the driver's seat.

Police arrested Haywood and Shavers on April 2, 2020. The circumstances surrounding Haywood's arrest are described in more detail below. Police interviewed both Haywood and Shavers on the day they were arrested, and recordings of the interviews were played for the jury.

Haywood and Shavers were tried together. There was no dispute that Haywood shot and killed the two victims. The only question was whether Haywood acted in self-defense. The jury was shown an approximately 10-minute video of the shooting that included footage from multiple sources, along with audio of the incident from a different source that was spliced onto the footage.

The jury convicted Haywood of two counts of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b))[1] and one count of shooting at an occupied motor vehicle (§ 246), and it found true for all three counts that Haywood had personally used a firearm within the meaning of section 12022.5, subdivision (a), and section 12022.53, subdivisions (b), (d), and (g). The jury also convicted Haywood of one count of exposing for sale an assault weapon (§ 30600, subd. (a)) and one count of unlawful possession of a firearm by someone previously convicted of a specified misdemeanor (§ 29805, subd. (a)).

The jury convicted Shavers of one count of exposing for sale an assault weapon (§ 30600, subd. (a)). The trial court dismissed a count of being an accessory after the fact because the jury was unable to reach a verdict on that charge.

The trial court sentenced Haywood to 81 years to life. His sentence is discussed in more detail below. The trial court sentenced Shavers to two years' probation.

## II.
### DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Allowing the Officer Who Arrested Haywood to Testify About Why He Used Force.*

1. Additional Background.

One of the issues that arose during the trial involved the force officers used in arresting Haywood. Haywood's counsel characterized the police investigation as having prematurely discounted the possibility Haywood acted in self-defense. As part of this characterization, during his opening argument counsel described the circumstances surrounding the arrest as

---

[1] All unspecified statutory references are to the Penal Code.

4

follows: "[T]he police were there in a van, see my client, and all of a sudden, boom, they come flying out. And they don't just come walking out, hey, Mr. Haywood, do you mind if we speak to you, with you for a moment. As the Prosecutor pointed out in his opening statement, they are looking for somebody that they believe is responsible for two homicides. Now, they'll default and call it a murder investigation. I think they get too hung up on the complexities of the law and the distinctions. Right? [¶] So they're looking for a murder suspect and they know a gun was used and a gun was outstanding. The gun that was used was still, obviously, in the possession of my client. So it stands to reason that think [*sic*] would want to use, I think the term that's become well-known in the first Gulf War, shock and awe. So they came up from behind him. They slammed him to the ground. One officer punched him in the face. Then they handcuffed him and drug him away to the police station, put him in a cell for 8 hours."

The police officer who hit Haywood during the arrest testified at trial. He was part of a SWAT/apprehension team assembled to execute the arrest. When asked by the prosecutor whether any precautions were involved in preparing to arrest Haywood, the following exchange took place:

"Based on the circumstances and the information that we had up until that point, we considered Mr. Haywood extremely armed and dangerous. Based on our investigation, we came to the conclusion that there was buying and selling of firearms, particularly assault rifles and the handguns. So he has already shown a propensity for violence in our eyes based on our investigation, and he—"

"[Defense counsel:] I am going to object and move to strike, and move to strike under [Evidence Code section] 352,[2] this notion of showing propensity for violence, and no foundation to establish that whatsoever." The trial court overruled the objection. The officer continued: "We were investigating a double homicide where two people were shot and killed and two other people were shot at and survived. Based on the firearms and, as I stated, the most serious of crimes that we were investigating, in addition to that firearm used in the crime had not yet been recovered, it was an extremely dangerous situation. We knew that the apprehension part of that, those were all concerns going into this."

The officer explained that to effectuate Haywood's arrest, the officers followed him in an unmarked police van to a liquor store where they saw him get out of his car. The officer did not know whether Haywood was armed but assumed he might be. The officer testified that as Haywood was returning to his car from the liquor store, "I quickly got out of the side door as other detectives exited the back door. I ran up to Mr. Haywood. I saw that he saw me. I am wearing my SWAT uniform that was clearly POLICE marked on it. As he saw me, I see him back-pedal into Bancroft Avenue. So now I am fearing several different things; that he is causing a traffic hazard, that he is potentially putting himself in danger. However, putting other people in danger, based on the severity of the crime, things such as if a car was to stop, if there would be a carjacking or something of that sort. I personally witnessed that in real life, and that was one of my great fears. So as he's back-pedaling[] [h]e raises his arms up a little bit. I cannot say it was a

---

[2] The statute provides that the court has discretion to exclude evidence if its probative value is substantially outweighed by the probability of substantial danger of undue prejudice.

6

fighting stance, but it was definitely a fight or flight mode, which is my interpretation of it. I believed he was going to run or turn and fight me. My concern, if he ran, um, I believe we would catch him. But if he made it into yards, I fear a barricaded situation, a hostage situation. Those are all things that we like to avoid.

"As I ran towards him as he's back-pedaling, I hit him with my right fist on the left side of his face in what I'd like to refer to as a distractionary blow. From that point, I tackled him. We went to the ground. Took him into custody. Pulled him back to the sidewalk out of traffic. And there were no injuries. I had scrapes on my hand. I believe he said maybe [he] might have pain to his face. But, all in all, a relatively safe action."

After the prosecutor finished his direct examination, Haywood's counsel asked to make a motion. Outside the presence of the jury, counsel renewed his request that the trial court strike the officer's testimony about Haywood having a "propensity" to violence. The trial court responded that the officer had used the term in the context of describing the precautions the officer had taken because the officer believed he was arresting someone who was armed and dangerous. Haywood's attorney then made a motion for a mistrial, since "[a] propensity essentially is an aspect of character. So simply because [the officer i]s permitted to explain why they took the precautions that they took does not blow-up the Evidence Code and permit impermissible character evidence to be presented to the jury. That is exactly what happened when he said that he was aware that my client had already shown a propensity for violence. A propensity is defined as an often intense inclination or natural tendency to behave in a particular way." When the trial court suggested that the facts surrounding the murders could show a propensity for violence, Haywood's counsel disagreed, stating that "[p]ropensity, I don't believe, can

7

be shown through a single act." According to Haywood's attorney, "the minute [the police officer] said 'propensity[,'] he's saying it's not just this case, he's saying I know this guy engages in this kind of behavior because he has a natural tendency to do so because he's done it before." The trial court stated that "[w]e don't know that anybody in this courtroom, except maybe you and the attorneys, know what propensity evidence is," and denied the motion for a mistrial.

The prosecutor offered to reopen his examination of the police officer to clarify that the officer had been referring only to the two murders. The next day, the prosecutor reported that he had confirmed with the police officer that the charged murders were the only prior violent acts of which he was aware. The prosecutor recalled the officer and asked more questions about the circumstances surrounding Haywood's arrest. Counsel asked, "And when you talked about knowing about prior violence, was that specifically and only related to what you knew about the incident behind the [grocery store] and that shooting?" The officer responded, "Yes, sir. That was the details we uncovered while viewing the video and throughout the investigation."[3]

Haywood's attorney began cross-examination asking about Haywood's arrest, asking, "So just to clarify a bit further, when you were referencing prior violence by my client yesterday in response to direct examination questions, the only knowledge of a prior, what in your mind was a violent act and in your mind my client was suspected of committing, was the [grocery store] shooting; is that correct?" The officer responded, "Yes, sir, that is what I was referring to."

---

[3] This testimony was offered without the withdrawal of Haywood's motion for a mistrial.

Later, jurors were shown the recording of Haywood's interview with police. At the beginning of the recording, Haywood asks, "Can you please tell me what the fuck is going on?" and tells officers, "I've been beat up."

2. Analysis.

Haywood argues that the officer's testimony was improperly admitted because it was irrelevant and highly prejudicial. We review the issue under the abuse of discretion standard of review. (*People v. Thompson* (2010) 49 Cal.4th 79, 128 [trial court's rulings on admission and exclusion of testimony reviewed under abuse-of-discretion standard].) The trial court did not abuse its discretion in permitting the testimony.

Haywood relies on various principles of law that do not assist him. Citing *People v. Scalzi* (1981) 126 Cal.App.3d 901, he suggests there is a general rule that an officer's state of mind regarding a suspect's arrest is never an issue. In *Scalzi*, the defendant was in the home of his friends when officers entered to execute a search warrant on the friends and their residence. (*Id.* at p. 903.) An officer saw what turned out to be methamphetamine and related paraphernalia. (*Id.* at pp. 903–904.) The officer then answered a phone call from a woman who asked for John (the defendant's first name), and the officer had a conversation with the woman that indicated the defendant had packaged methamphetamine to bring to the woman. (*Id.* at pp. 905–906.) The officer was permitted to testify at trial about the conversation over a hearsay objection, with an instruction that the jury was to consider the testimony only to prove the officer's state of mind. (*Id.* at pp. 904–905.) Division Three of this court held that the testimony was improperly admitted, because the officer's "state of mind did not tend to prove or disprove any issue in the case," and the officer's reaction after his

telephone conversation "shed no light on any issues presented in the case." (*Id.* at p. 907.)

*Scalzi* has little bearing here. The testimony of the officer who arrested Haywood did not involve hearsay and, more importantly, was relevant to explain why the officer used force when arresting Haywood, an issue Haywood's attorney highlighted during his opening statement. Haywood argues more generally that "hearing that the police interpreted [Haywood's] actions as showing a propensity for violence impermissibly influenced the jurors" to reject his claim of self-defense. He further argues that "[h]earing that a police officer believed [Haywood] was showing a 'propensity for violence' when he shot at men who had just robbed him and assaulted him with a firearm would inflame and irrevocably bias jurors." But police obviously had not yet spoken to Haywood when they arrested him and thus were unaware of his claims of self-defense. What they knew at that time was that Haywood was suspected of shooting 10 times at a car and killing two people.

Nor was the officer's testimony "tantamount to expressing the opinion that [Haywood] was guilty," as Haywood claims. Haywood relies on *People v. Torres* (1995) 33 Cal.App.4th 37, where a gang expert was improperly permitted to testify that a drug dealer's interaction with a gang member amounted to a robbery, since witnesses are not permitted to express an opinion on the definition of a crime. (*Id.* at pp. 43–46.) The officer who testified in this case offered no such opinion, only an explanation as to why he used force when arresting Haywood.

We similarly reject Haywood's argument that the officer's testimony was analogous to highly prejudicial "character evidence." Haywood complains that jurors were not instructed that they could use the officer's

10

testimony only to explain why he used force, and that without such an instruction "the jury did not know it was not allowed to use [the officer's] . . . testimony that police judged appellant to have a propensity for violence when they assessed his motives in shooting." Again, though, the officer was not testifying about Haywood's motives—something the officer would have known nothing about at the time of the arrest since police had not yet questioned Haywood.

As did his trial attorney in the trial court, Haywood on appeal exaggerates the effect of the officer's use of the word "propensity." He claims the officer's statement was "straightforward: [He] treated [Haywood] like a violent felon because police had already determined that is who he was." We disagree that the officer's single statement about the circumstances surrounding Haywood's arrest was so prejudicial that jurors could not place it in the context of the overall facts of the case. This is particularly true considering the officer clarified under both direct and cross-examination that he was acting based on information learned in this case and not on any previous acts. While it may be true, as Haywood stresses on appeal, that jurors likely knew the meaning of the word *propensity*, it does not follow that they were aware of the legal significance of *propensity evidence*, something that was not offered here.

In short, we conclude the trial court did not abuse its discretion in admitting the officer's testimony. As a result, we need not address Haywood's arguments that the admission violated his right to a fundamentally fair trial in violation of the Fourteenth Amendment or that reversal is thus required.

11

*B. Haywood's Claims of Instructional Error Lack Merit.*

    1. Additional Background.

Consistent with Haywood's claim of self-defense, the jury was instructed under CALCRIM No. 505 that Haywood was not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another.[4] It was also instructed that Haywood was guilty of voluntary manslaughter instead of murder if he acted in imperfect self-defense. (CALCRIM No. 571.) Jurors were told that the difference between complete self-defense and imperfect self-defense depended on whether Haywood's belief in the need to use deadly force was reasonable. The instruction explained that Haywood acted in imperfect self-defense if (1) he actually believed he was in imminent danger of being killed or suffering great bodily injury and (2) he actually believed the immediate use of deadly force

---

[4] The instruction provided that Haywood acted in such self-defense if he reasonable believed he or Shavers were in imminent danger of being killed, or suffering great bodily injury, or of being robbed or assaulted with a firearm; Haywood reasonably believed that the immediate use of deadly force was necessary to defend against the danger; and Haywood used no more force than was reasonably necessary to defend against the danger. Jurors were further told that a belief in future harm was not sufficient, "no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger to himself or Angel Shavers of death or great bodily injury or being robbed or assaulted with a firearm. [¶] Defendant's belief must have been reasonable and he must have acted only because of that belief. [¶] The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. [¶] If defendant used more force than was reasonable, the killing is not justified."

12

was necessary to defend against the danger but (3) at least one of the two foregoing beliefs was unreasonable.

As Shavers requested, the jury also was provided with a unanimity instruction, CALCRIM No. 3500. Jurors were instructed that the People had presented evidence of more than one act to prove Haywood was guilty of murder, and that "[e]ach shot fired is a possible act the jury must consider. You must not find the defendant guilty of murder unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

The prosecutor apparently did not mention the unanimity instruction during closing argument. Haywood's trial attorney briefly mentioned it when he stated, "So another instruction that you will receive is an instruction on unanimity; that when evidence is presented that show[s] that there are various acts that may have resulted in, say, for example death, you must be unanimous in your determinations to which act resulted in the death, just like you must be unanimous to render a verdict in this case. [¶] And to reach a unanimous verdict in any case requires that you sit down as a group of 12 and discuss the evidence, discuss the evidence, use your common sense, analyze the law provided by the court."

### 2. The Court's Unanimity Instruction Did Not Violate Haywood's Right to a Fair Trial.

Haywood argues for the first time on appeal that the unanimity instruction amounted to a misstatement of the law of self-defense, which violated his rights under the Fourteenth Amendment to due process and a fair trial. We are not persuaded.

According to Haywood, telling the jury that "[e]ach shot fired is a possible act the jury must consider" required jurors "to artificially separate

13

each individual shot in a rapid, reactive, one-minute salvo," which "ha[d] no basis in the law of self-defense." Haywood omits the context that this instruction did not concern his claim of self-defense but instead involved a standard unanimity instruction regarding the multiple acts presented that might support a murder conviction.

We agree with respondent that the unanimity instruction was unnecessary and, if anything, *benefitted* Haywood. "[C]ases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) "A unanimity instruction is required *only* if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People v. Maury* (2003) 30 Cal.4th 342, 423, italics added.) When different theories of a crime are "based on a continuous course of conduct, whose acts were so closely connected in time as to form part of one transaction," no unanimity instruction is required. (*Ibid.* [no unanimity instruction required where victim's death caused by strangulation, blow to head, or combination of both injuries, which happened close together].)

Because Haywood fired shots in close succession, there was no real contention that jurors were required to decide which specific bullet (or bullets) killed the victims and thus amounted to murder. When a jury is given correct instructions on a legal principle that is not relevant to the issues in the case, the error is reviewed under *People v. Watson* (1956)

14

46 Cal.2d 818, 836.[5]  (See *People v. Mills* (2012) 55 Cal.4th 663, 680–681.) That is, we determine whether a result more favorable to Haywood was reasonably probable absent the irrelevant instruction.  (*Id*. at p. 681.) Because jurors were given complete and accurate instructions on the relevant issue of self-defense, there is no reasonable likelihood that the absence of the unanimity instruction would have been more favorable to Haywood.  It is simply not the case that jurors were told they "must perform an individual analysis as to 'each shot' in a one-minute blur of reaction," as Haywood claims.

True, the prosecutor highlighted during closing argument that Haywood fired 10 shots, but that was in the context of arguing that Haywood used more force than necessary for self-defense, not that jurors had to decide whether each individual shot amounted to self-defense.  To the extent the jurors might have relied on the unnecessary unanimity instruction, this would have *increased* the prosecution's burden since jurors would have had to agree on the shot or shots that constituted an element of murder.  For all these reasons, we reject Haywood's argument.

### 3. The Trial Court Properly Instructed the Jury on Imperfect Self-Defense.

We also reject Haywood's argument, again raised for the first time on appeal, that the trial court failed to properly instruct the jury on imperfect self-defense, thus violating his right to due process under the Fourteenth Amendment.

As we have said, jurors were instructed under CALCRIM No. 571 that Haywood was guilty of voluntary manslaughter instead of murder if he acted

---

[5] Haywood cites no authority for his argument that we review his claim of instructional error under *Chapman v. California* (1967) 386 U.S. 18.

in imperfect self-defense. Again, the instruction provided that Haywood acted in imperfect self-defense if (1) he actually believed he was in imminent danger of being killed or suffering great bodily injury and (2) he actually believed the immediate use of deadly force was necessary to defend against the danger but (3) at least one of the two foregoing beliefs was unreasonable. Haywood contends that the self-defense instructions were faulty because jurors were not told "that using excessive force in the course of self-defense could be voluntary manslaughter." He says the instructions "did not explain that if the jurors believed appellant was acting in self-defense but used excessive force, his actions constituted imperfect self-defense."

Division Four of this court considered, and rejected, a similar argument in *People v. Morales* (2021) 69 Cal.App.5th 978 (*Morales*). There, as here, the defendant argued that CALCRIM No. 571 "was insufficient because it failed to tell the jury that a homicide also qualifies as voluntary manslaughter and not murder when a defendant's beliefs in danger and the need to use deadly force are reasonable but the sort of deadly force he uses is excessive and more than necessary to repel the attack." (*Id.* at p. 995.) The court noted that the defendant had "cite[d] no authority for his position that one type of deadly force could be reasonable but another could be excessive. The relevant consideration is *whether a defendant uses more force than is necessary* to repel an attack, not the type of deadly force used by a defendant." (*Id.* at p. 996, italics added.) If a defendant reasonably believes that there is a need for force but uses more force than what is necessary, the defendant cannot claim perfect self-defense. (*Id.* at p. 995.) As a result, a defendant likewise cannot in such circumstances claim imperfect self-defense. (*Ibid.*) That means that if Haywood reasonably believed that Palmer's action justified

16

Haywood's use of force but he used more than what was necessary, he could not claim perfect *or* imperfect self-defense.

As the defendant claimed in *Morales*, Haywood claims support in *People v. Mayfield* (1997) 14 Cal.4th 668.[6] (*Morales*, *supra*, 69 Cal.App.5th at p. 996.) In *Mayfield*, a defendant who was charged with murdering a police officer as the officer was trying to arrest him claimed that the officer had used excessive force against him, and that the officer's gun fired accidentally when the defendant reached for the officer's hands. (*Mayfield* at pp. 702–703.) Jurors were instructed that if they found that the officer used unreasonable force, and that the defendant used only reasonable force to protect himself, he was not guilty of murder. (*Id.* at p. 777.) The defendant argued on appeal that the instruction was incomplete because it did not provide that if a person uses unreasonable force, the resulting killing would be at most voluntary manslaughter. (*Ibid.*) The court noted that only an honest but unreasonable belief that the force used was necessary would negate the malice necessary for murder. (*Ibid.*) Because the jury had been instructed to that effect, the court concluded, no error occurred. (*Id.* at pp. 777–778.) Haywood claims it was error not to include such an instruction here, but he is mistaken. As explained in *Morales*: "[T]he negation of malice is immaterial for the purposes of the jury. *Mayfield* did not hold . . . that the jury necessarily had to be instructed on how imperfect self-defense impacts the concept of malice. [Citation.] Although the instruction in *Mayfield* did explain that imperfect self-defense negated malice, *Mayfield* found the instruction there sufficient because it made clear that the question of whether an imperfect self-defense theory will preclude a murder conviction

---

[6] *Mayfield* was abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, footnote 2.

turns on the jury's assessment of whether the defendant's belief in the need to use deadly force was sincere, even if unreasonable." (*Morales*, *supra*, 69 Cal.App.5th at p. 996.) Here, as in *Morales*, CALCRIM No. 571 adequately informed the jury of this principle. (*Morales* at pp. 995–996.)

Haywood claims that *Morales* is distinguishable because there, the defendant stabbed the victim a single time with a knife. (*Morales*, *supra*, 69 Cal.App.5th at p. 996.) The court noted that if the defendant "reasonably believed he needed to use deadly force to prevent [the victim] from harming him, his use of a single stab with his knife would appear to be reasonable." (*Ibid.*) *Morales* stressed, though, that the defendant had "cite[d] no authority for his position that one type of deadly force could be reasonable but another could be excessive," and that "[t]he relevant consideration is whether a defendant uses more force than necessary to repel an attack, not the type of deadly force used by a defendant." (*Ibid.*)

Here, as Haywood notes, the prosecution certainly stressed that shooting 10 times was excessive and demonstrated that Haywood used more force than necessary to defend himself. Haywood testified on cross-examination that the reason he continued to fire his gun at Palmer's car even though he could no longer see Palmer's gun was because his "adrenaline[ wa]s rushing," and he "d[id]n't know what's going on at th[at] point." When confronted with the fact that Palmer's car appeared to move after Haywood's first shot, Haywood testified, "I remember the gun being pointed at me. I really don't remember what he was doing. At that point, like I said, blood's rushing to your head, adrenaline's pumping, I'm in a defense mode." Had the jury accepted this version of events that Haywood feared for his life the entire time he was shooting, his response would appear to be reasonable, just as the single stab in *Morales* would, and the imperfect self-defense instruction given

18

to the jury sufficiently conveyed the law.  Haywood's instructional argument lacks merit.

Finally, because we have rejected Haywood's claims of error, we likewise reject his argument that the cumulative effect of the supposed errors requires reversal.  (See *People v. Kipp* (1998) 18 Cal.4th 349, 383 [issues raised on appeal did not singly or cumulatively establish prejudice requiring reversal of convictions].)

## C. Haywood Identifies No Reason His Case Should Be Remanded for Resentencing.

### 1.  Additional Background.

"Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill No. 81), effective January 1, 2022, amended section 1385 'to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice.'  ([Citation]; see Stats. 2021, ch. 721, § 1.)  Under this amendment, the trial court has new guidance in deciding whether to strike . . . enhancements." (*People v. Coddington* (2023) 96 Cal.App.5th 562, 569.)

The trial court sentenced Haywood on March 11, 2022, around two months after Senate Bill No. 81 took effect.  The trial court noted that the penalty for second degree murder is 15 years to life; the penalty for one of the gun enhancements found true (§ 12022.5, subd. (a)) is three, four, or 10 years; and the penalty for a separate gun enhancement (§ 12022.53, subd. (d)) is 25 years to life.  The court then noted the recent change in law, stating, "The court has the discretion to order sentences [to] run concurrently or consecutively or to strike certain gun enhancements.  The Legislature's changed the law so the court—it[']s changed the law in a way that's interesting.  They encourage the court to exercise discretion, while taking

19

away the court's discretion that it previously had to impose enhanced sentences."

Because the trial court's analysis of the new law is relevant to Haywood's appellate arguments, we quote at length the court's explanation of the sentence imposed: "[O]ne of our new laws for this year in California, Penal Code section 1385(c)(1) through (6), (c)(1) says the court can dismiss the use of the gun if it is in the furtherance of justice. Given the facts of this case where a person fires 10 to 15 shots into an occupied motor vehicle while firing from behind the vehicle when there is no physical evidence that would suggest that at the time the shots are fired there was anyone pointing a gun at him or threatening to shoot him or had a gun sticking out the window, it seems that rather Mr. Haywood was upset at having been taken advantage of and let the assault weapon out of his hands without receiving payment. To dismiss the gun enhancements as to Palmer and Tyler would not be in the interest of justice, and the court is not going to exercise its discretion to do so.

"Under [section] 1385(c)(3),[7] that code says, that new law says that in an appropriate case the court may exercise its discretion if certain other things are true. I think there's about (a) through (f), or something like that. Only two of them seem to potentially apply here, [section] 1385 (c)(3) capital (B), are there multiple enhancements, and [section] 1385(c)(3) capital (C), will the sentence be more than 20 years if the court imposes that enhancement. The court would note that [section] 12022.53(d), the code section that is in play on count one and two and three, by itself, calls for an indeterminate term of 25 years to life. Reading the—this sentence and

_____

[7] The statute has since been renumbered so that the mitigating circumstances are listed in subdivision (c)(2), not (c)(3). We shall cite to the current version of the statute in our analysis.

20

interpreting its application, the court finds that the logical interpretation of this language in [section] 1385(c)(3)(C) . . . is that this relates to determinate sentences and not to indeterminate life sentences.

"There are three remaining counts for which there are determinate sentences which are not life sentences. The shooting into a car is a three, five, or seven year term. The selling of a[n] assault weapon is a four, six, or eight year term. And the possession—unlawful possession of the Glock is 16 months, 24 months, or 36 months.

"Interestingly, in those three crimes the Legislature says you can exercise your discretion, but you can't give the aggravated term because we tried this case last year and the law wasn't in effect and we didn't have a trial on any aggravating circumstances."

The court then sentenced Haywood to 15 years to life for the second-degree murder of Kline, plus a consecutive term of 25 years to life for a firearm enhancement. The court then concluded it was in the interest of justice to impose a consecutive term of 15 years to life for the murder of the second victim (Palmer). Instead of imposing an additional life term for a firearm enhancement for the murder of Palmer, the court exercised its discretion to impose a consecutive 20-year term on a firearm enhancement instead of the 25-years-to-life term contemplated by section 12022.53, subdivision (d), relying on *People v. Tirado* (2022) 12 Cal.5th 688, 692 [trial courts have discretion to strike § 12022.53, subd. (d) enhancement and impose lesser uncharged statutory enhancement]. On the conviction for shooting into a motor vehicle (count three), the court imposed the midterm of five years, then stayed the term (§ 654). As for the firearm enhancement on that count, the court struck the term, imposed a lesser term, then stayed it. The court lastly imposed a consecutive six years (the midterm) for the

conviction for the sale of the assault rifle, and two years for possession of a firearm, which was stayed.

### 2. A Remand for Resentencing Is Not Warranted Under Section 1385, subdivision (c)(2).

As amended by Senate Bill No. 81, section 1385, subdivision (c)(1), provides trial courts with new guidance on how to exercise its discretion to dismiss enhancements. The section establishes a general directive that "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so." In elaborating on this directive, the section states, "the court shall consider and afford great weight to evidence" a defendant offers on various enumerated mitigating circumstances. (§ 1385, subd. (c)(2)(A)-(I).) A defendant's proof of one or more of the circumstances "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).)

### a. Section 1385, subdivision (c)(2)(B).

As the trial court recognized, two of the enumerated circumstances are potentially relevant here. The first one provides that "all enhancements beyond a single enhancement shall be dismissed" when "[m]ultiple enhancements are alleged in a single case." (§ 1385, subd. (c)(2)(B).) Haywood contends that the trial court failed to consider this circumstance, and that it requires dismissal in every case where multiple enhancements are alleged. We are not persuaded.

Courts have consistently rejected the notion that dismissal is necessarily required under the seemingly mandatory provisions of section 1385, subdivision (c)(2). As explained in *People v. Walker* (2022) 86 Cal.App.5th 386 (*Walker*): "To be sure, on its face and considered in

22

isolation, the phrase 'all enhancements beyond a single enhancement shall be dismissed' seems to fairly unambiguously dictate that, if there is more than one enhancement, all but one 'shall' be dismissed. But we are not permitted to pluck this phrase out of its placement in the statute and consider it in isolation; instead, we are required to consider where it fits into the ' " 'context of the statute as a whole.' " ' [Citations.] And, in this case, the context is critical. The phrase 'all enhancements beyond a single enhancement shall be dismissed' is not a standalone mandate of section 1385. . . . Section 1385 explicitly instructs that the existence of a mitigating circumstance—including the one for '[m]ultiple enhancements'—'weighs *greatly* in favor of dismiss[al]' of an enhancement as the court is exercising its discretion under section 1385 to evaluate whether dismissal is in the furtherance of justice by weighing enumerated and unenumerated mitigating factors against whether dismissal of an enhancement would 'endanger public safety.' [Citation.] If we were to read the phrase appended to the multiple enhancements mitigating factor as *automatically* mandating dismissal of all but one enhancement whenever multiple enhancements exist, then the existence of multiple enhancements would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively*."[8] (*Walker* at pp. 396–397.)

More recently, Division One of the Fourth Appellate District likewise rejected the argument that the "shall be dismissed" language of section 1385,

---

[8] *Walker* also considered the meaning of directing trial courts to "afford great weight" to the presence of mitigating circumstances (§ 1385, subd. (c)(2)). (*Walker*, *supra*, 86 Cal.App.5th at p. 398.) Our Supreme Court has granted review on the question of whether the requirement to "afford great weight" to enumerated mitigating circumstances creates a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds that the dismissal would endanger public safety. (*People v. Walker*, S278309, petn. rev. granted Mar. 22, 2023.)

subdivision (c)(2)(B) and (C) requires dismissal of all but one enhancement in cases in which multiple enhancements were proven. (*People v. Mazur* (2023) 97 Cal.App.5th 438, 444, petn. rev. granted Feb. 14, 2024, S283229.) "As our sister courts have concluded, the statutory phrase 'shall be dismissed' in section 1385, subdivision (c)(2)(B) and (C) cannot be read in isolation. [Citations.] Construed as a whole, the statute makes clear that all the mitigating circumstances listed in subdivision (c)(2) merely guide the court's discretion in determining whether a dismissal is in furtherance of justice. Subdivision (c)(1) first sets forth the controlling 'furtherance of justice' standard for dismissal. Subdivision (c)(2) then states that the court must give great weight to the presence of any one or more of the nine listed mitigating circumstances '[i]n exercising its discretion' whether to dismiss. Subdivision (c)(3) confirms the discretionary nature of this decision by stating that the court 'may exercise its discretion at sentencing' but is not prevented 'from exercising its discretion' earlier in the proceedings. We therefore conclude that the 'shall be dismissed' language of the mitigating circumstances in subdivision (c)(2)(B) and (C)—read in the context of the statute as a whole—only requires the court to dismiss the enhancement if it first finds that dismissal is 'in the furtherance of justice.' (§ 1385, subd. (c)(1).)" (*Mazur* at p. 445.) We see no reason to adopt Haywood's contention that dismissal was required as a matter of law under section 1385, subdivision (c)(2)(B).

Here, the trial court acknowledged its discretion under section 1385 but specifically found under the facts of the case that "[t]o dismiss the gun enhancements as to Palmer and Tyler *would not be in the interest of justice*, and the court is not going to exercise its discretion to do so." (Italics added.)

This was consistent with the trial court's discretion under the amended statute, and we see no need to disturb the trial court's conclusion.

### b. Section 1385, subdivision (c)(2)(C).

The second circumstance that the trial court flagged as potentially relevant here states that "the enhancement *shall* be dismissed" when its application "could result in a sentence of over 20 years." (§ 1385, subd. (c)(2)(C), italics added.) We question the trial court's apparent conclusion that the subdivision categorically does not apply to indeterminate sentences.[9] Even if we were to reject the court's rationale, we of course will not reverse if the trial court's conclusion was legally correct even if its reasoning was not. (E.g., *People v. Smithey* (1999) 20 Cal.4th 936, 972.)

We need not ultimately address the proper interpretation of the subdivision, however, because Haywood does not base his challenge on it. And since the time of Haywood's sentencing, courts have held that, despite the mandatory language in the subdivision, dismissal of an enhancement remains discretionary, at least in some circumstances. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 291 (*Mendoza*); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 20–21 (*Lipscomb*).) These courts have reasoned that the mandatory language must be read in conjunction with the overall discretion afforded under section 1385, subdivision (c)(2), and its recognition that courts must consider whether dismissing an enhancement would endanger public safety (*ibid.*). (*Mendoza* at p. 291; *Lipscomb* at p. 18.)

---

[9] We recognize, though, that the court was familiar with the recent changes to section 1385 and understood it had new sentencing discretion. Relying on *People v. Tirado*, *supra*, 12 Cal.5th 688, which had been decided less than two months before the sentencing hearing, the court reduced one of the enhancements from an indeterminate to a lesser determinate sentence.

25

Although *Mendoza* and *Lipscomb* were both decided before the filing of Haywood's opening brief, he does not cite them in his appellate briefing, much less distinguish them or argue that they were wrongly decided. To the extent Haywood contends he was entitled to sentencing relief as the result of section 1385, subdivision (c)(2)(C), we reject this suggestion.

### 3. There Is No Reason to Remand for the Trial Court to Consider Imposing a Five-year Term Under Amended Section 654.

Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654, subdivision (a), to provide in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (See *People v. Jones* (2022) 79 Cal.App.5th 37, 43, 45; Stats. 2021, ch. 441, § 1.) The statute previously "required an act or omission punishable in different ways by different laws to be punished under the law that provided for the longest potential term of imprisonment. Assembly Bill 518 amended Penal Code section 654 to afford sentencing courts the discretion to punish the act or omission under either provision." (*People v. Mani* (2022) 74 Cal.App.5th 343, 351.) The amended statute was in effect at the time of Haywood's sentencing hearing.

In sentencing Haywood, the trial court imposed consecutive indeterminate sentences for the two murders, then stayed the five-year maximum term for shooting into a motor vehicle (count three) since that conviction was based on the same conduct (§ 654). In doing so, the court focused extensively on the provisions of section 654 that were not affected by the amendments; namely, that it was not required to stay the sentence regarding one of the victims since multiple punishments are permitted where there are multiple victims. The court concluded it was "in the interest of

26

justice" to impose a consecutive sentence for the second victim. The court further stressed all the "very stark facts" that weighed in favor of imposing consecutive indeterminate sentences: Haywood "emptied" his gun even as Palmer was driving away and the windows were pulled up, he denied to police he had done anything wrong, and he was "somewhat cavalier in [his] attitude and almost in a sense laughing at the police, and in a way laughing at them and taunting them to, you know, think that they wouldn't be able to prove their case."

Under the amended version of section 654, the trial court had the previously unavailable option to impose the shorter, determinate five-year term on count three and to stay the longer, indeterminate sentences. (*People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.) Haywood argues this case should be remanded so that the trial court can "exercise informed discretion" and possibly select this option. We are not persuaded.

As a reviewing court, we must presume that the trial court was aware of and applied the amended statute, which—as we have said—was in effect at the time of the sentencing hearing. (See *People v. Brown* (2007) 147 Cal.App.4th 1213, 1229 ["remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion"].) This presumption is particularly apt here because, although the trial court did not specifically mention the recent amendments to section 654, it demonstrated its familiarity with many recent changes in sentencing laws. (*Ante*, fn. 9.) There is simply no reason for us to presume the court was unaware of the amendment.

Because Haywood has not rebutted the presumption of validity of the trial court's ruling, we need not consider his argument that any failure to argue for the lesser sentence under amended section 654 amounted to

ineffective assistance of counsel. We stress, though, that the trial court highlighted the reasons that weighed in favor of consecutive indeterminate sentences. This means any failure to argue for a lesser sentence under the revised statute did not prejudice Haywood since the record reflects the trial court favored a lengthy sentence.

*D. Haywood's Abstract of Judgment Must Be Corrected.*

Finally, Haywood argues, and respondent agrees, that he is entitled to a correction to his abstract of judgment. Respondent has raised an additional error, which we likewise order be corrected. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate courts may correct clerical errors in abstracts of judgment at any time].)

Both the clerk's transcript and the reporter's transcript of Haywood's sentencing hearing reveal that the trial court sentenced Haywood to 15 years to life on count 2 (the murder of Kline), plus a consecutive term of 15 years to life on count 1 (the murder of Palmer). But Haywood's abstract of judgment states that he received 25 years to life on both counts 1 and 2. We agree with both parties that the abstract of judgment must be corrected to reflect that Haywood received 15 years to life on both counts 1 and 2.

The clerk's and reporter's transcripts also reveal that the trial court sentenced Haywood to 25 years to life for a firearm enhancement on count 2 (§ 12022.53, subd. (d)). As respondent notes, however, the abstract of judgment states that Haywood received 25 years on this enhancement. The abstract should be corrected to indicate that Haywood was sentenced to the indeterminate term of 25 years to life on the enhancement for count 2 (§ 12022.53, subd. (d)).

*E. The Trial Court Did Not Abuse Its Discretion in Declining to Give Shavers's Proposed Pinpoint Jury Instruction.*

1. Additional Background.

As the jury was instructed (CALCRIM No. 2560), in order to convict Shavers of exposing for sale an assault weapon (§ 30600, subd. (a)), the prosecution was required to prove that Shavers (1) "offered or exposed for sale an assault weapon, specifically, a semiautomatic, centerfire rifle that does not have a fixed magazine, but has a pistol grip that protrudes conspicuously beneath the action of the weapon," (2) knew she offered or exposed it for sale, and (3) "knew or reasonably should have known that it had the characteristics that made it an assault weapon." As for this third element regarding Shavers's knowledge, there was evidence presented that she claimed unfamiliarity with guns. During her interview with police on the day of her arrest, she repeatedly said that she did not work with guns and did not know much about them.

Shavers, joined by Haywood, proposed the following pinpoint jury instruction regarding familiarity with firearms: "In determining whether the defendant knew or reasonably should have known a firearm had the distinctive characteristics of an assault weapon, you should consider the totality of circumstances, including the defendant's familiarity with the firearm in question, the length of possession, and guns in general." (*In re Jorge M.* (2000) 23 Cal.4th 866, 884–886 [scienter requirement].) The trial court concluded that the standard CALCRIM instruction was sufficient and declined to give the pinpoint instruction.

During her closing argument, Shavers's trial attorney stressed the factors she listed in the proposed pinpoint instruction, asking the jury: "[W]e have to ask ourselves is Angel the type of person who knows guns well? Is

29

she really that familiar with this rifle?  Has she been in possession of this rifle long enough to know it's an assault weapon?  Has she even seen this rifle in person, other than sending a picture of it to Dwayne Palmer, a picture she didn't even take herself?"

2.  Analysis.

Shavers argues that the trial court prejudicially erred when it refused to provide the jury with her proposed pinpoint jury instruction.  We review this question for an abuse of discretion (*People v. Kraft* (2000) 23 Cal.4th 978, 1063 (*Kraft*)) and conclude that the trial court did not abuse this discretion.

"A defendant has the right, on request, to instructions that pinpoint the theory of the defense, *not specific evidence as such*." (*Kraft*, *supra*, 23 Cal.4th at p. 1063, italics added.)  A trial court may refuse requested instructions where they "merely invite[] the jury to draw inferences favorable to [the defendant] from selected items of evidence." (*Ibid*.)  Even if a trial court errs in refusing to give a proposed pinpoint instruction, reversal is appropriate only if it is reasonably probable that had the jury been given the proposed instruction, the jury would have come to a different conclusion.  (*People v. Earp* (1999) 20 Cal.4th 826, 887; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

While it is no doubt true, as Shavers argues, that her proposed pinpoint instruction addressed her level of knowledge about the firearm at issue, we disagree that the trial court was required to give it.  "The question of the defendant's knowledge [regarding assault weapons] or negligence is, of course, for the trier of fact to determine, and depends heavily on the individual facts . . . in each case." (*In re Jorge M.*, *supra*, 23 Cal.4th at pp. 887–888.)  Given that Shavers's attorney was free to highlight all those individual facts in this case and the instruction as given accurately

summarized the knowledge requirement for conviction, we find no instructional error under the circumstances.

## III.
### DISPOSITION

Shavers's conviction is affirmed (No. A164913).

Haywood's abstract of judgment shall be corrected as follows:  The abstract shall indicate that Haywood was sentenced to 15 years to life on counts 1 and 2 (not 25 years to life).  And it shall also indicate that Haywood was sentenced to 25 years to life on the enhancement for count 2 (not a determinate 25 years).  The trial court is directed to send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. The judgment in No. A164910 is otherwise affirmed.

_____
Humes, P. J.

WE CONCUR:


_____
Banke, J.


_____
Castro, J.*


*Judge of the Superior Court of the County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Haywood / People v. Shavers*  A164910, A164913

32